# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JOHNATHAN WILLIAMS and
ANTHONY ARONA,

      Plaintiffs,

v.                                    Case No: 8:20-cv-1647-CEH-JSS

3RD HOME LIMITED, 3RD HOME
LIMITED CO. and WADE SHEALY,

      Defendants.

_____/

## O R D E R

In this shareholder dispute, Plaintiffs Johnathan Williams and Anthony Arona sue Defendants, 3rd Home Limited, 3rd Home Limited Co., and Wade Shealy in a three-count Complaint seeking to wind up 3rd Home (Count I); to hold Shealy liable for breach of fiduciary duty (Count II); and for the appointment of a receiver or custodian to preclude the misappropriation of 3rd Home's assets. This matter is before the Court on Defendants 3rd Home Limited, 3rd Home Limited Co., and Wade Shealy's (collectively "Defendants") Motion for Summary Judgment (Doc. 63), Plaintiff Johnathan Williams ("Williams") and Anthony Arona's ("Arona") response in opposition (Doc. 69), Defendants' reply (Doc. 71), and the parties' Joint Stipulations (Doc. 70). Additionally, the parties filed supplemental briefing, at the Court's request (Doc. 75), on Plaintiffs' Count I claim to "wind up" 3rd Home under Cayman Islands law.  Docs. 81, 82, 83. Because the Court was in doubt as to Plaintiff

Johnathan Williams' standing to bring this action in his own name, as opposed to in the name of the shareholder, the "John I. Williams, Jr. Revocable Trust," the Court issued an Order to Show Cause (Doc. 84), to which Plaintiff Johnathan Williams responded (Doc. 85). Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, legal memoranda and accompanying exhibits, for the reasons that follow, Defendants' Motion for Summary Judgment (Doc. 63) will be granted.

## I.    BACKGROUND[1]

3rd Home Limited (and later 3rd Home Limited, Co.) (collectively, "3HL") was formed in 2011 in the Cayman Islands with its registered office in care of Intertrust Corporate Services. Doc. 70 ¶ 1. In 2019, 3HL sought to decommission its status in the Cayman Islands and thereafter domesticate the company under the laws of the State of Delaware. *Id.* ¶ 2. 3HL is a privately held company.[2] Doc. 63 at 1.

3HL is an internet-based luxury property and travel club where members exchange vacation homes, in addition to other benefits. Doc. 1-1 ¶ 15; Doc. 44 ¶ 15. To qualify as a member of 3HL, an individual must own a second/vacation home. To participate in the program, the owner makes the second/vacation home available to

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Joint Stipulations (Doc. 70). For purposes of summary judgment, the Court presents the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

[2] As described by Defendants, there is only one 3rd Home Company: a Delaware corporation, which is the successor of a prior Cayman Islands company. Doc. 81 at 1. Plaintiffs do not dispute this.

3HL's Property Exchange Program. 3HL now claims to have over 10,000 homes available to its members through its inventory, which is located in North America, Central America, the Caribbean, Europe, South America, Asia, Australia, and Africa. Doc. 1-1 ¶¶ 22, 23; Doc. 44 ¶¶ 22, 23. 3HL operates a website for its members for the use and exchange of their properties. Doc. 70 ¶ 3. Members swap homes with those of other members. Doc. 1 ¶ 17. Members pay a relatively small exchange fee for the use of another member's property. Doc. 64-1 at 69–71.

Some of 3HL's members are shareholders. Doc. 70 ¶ 6. Specifically, 215 of 3HL's members have invested in 3HL through the purchase of stock in the form of participating shares. *Id.* ¶ 5. 3HL has two categories of shares: (1) Management Shares which are held exclusively by Shealy; and (2) Participation Shares. Doc. 64-5 at 276–77. Williams and Arona are Members of 3HL and have purchased participation shares in unit increments.[3] Doc. 1-1 ¶ 16; Doc. 44 ¶ 16. All 100 of 3HL's management shares, which are the only voting shares, are held by its Founder and Chief Executive Officer, Wade Shealy. Doc. 70 ¶ 7; Doc. 1-1 ¶ 28; Doc. 44 ¶ 28. Thus, as the sole holder of voting shares, Shealy controls the outcome of all matters relating to management of 3HL that is not subject to the vote of the Board of Directors, including the election and

---

[3] Plaintiff Johnathan Williams alleges in the Complaint that he purchased 3HL shares (Doc. 1-1 ¶ 16), and Defendants admitted this allegation (Doc. 44 ¶ 16). There was no qualification on these allegations that the purchase of the shares was by the John I Williams, Jr. Revocable Trust or that Williams' purchase of the shares was as the Trustee of a trust. In 2020, this lawsuit was filed in the name of "Johnathan Williams," who in September 2023 filed an affidavit (Doc. 85) in the name of "John Williams a/k/a John Irving Williams, Jr." stating he purchased shares of 3HL in the name of a revocable trust and such shares of 3HL became assets of the trust estate.

removal of Directors, and the merger, consolidation, or sale of all or substantially all of 3HL's assets. Doc. 1-1 ¶ 28; Doc. 44 ¶ 28.

"Keys" are needed to use properties in the 3HL exchange system. Doc. 70 ¶ 4. Members pay an exchange fee and other expenses for the use of a property in the 3HL exchange program. *Id.* ¶ 5. Shareholders receive keys for their investments. *Id.*

Arona bought 275,000 Participation Shares and invested $275,000.00 in 3HL. Doc. 70 ¶¶ 8, 9. Williams bought 1,100,000 Participation Shares and invested $537,500.00 in 3HL. *Id.* ¶¶ 10, 11. Given the level of their investment, Plaintiffs were afforded the opportunity to be a part of 3HL's "Founders Circle Club," which included the benefits expressed in 3HL's Founder's Circle Offering Term Sheet. *Id.* ¶ 12. Founders Circle members are not required to make their properties part of the 3HL inventory, but some elect to do so, and at a prior time, both Plaintiffs had properties in the 3HL inventory. Doc. 1-1 ¶ 21; Doc. 44 ¶ 21. Plaintiffs admit they received what they were promised as Founders Circle Members, including dozens of "keys" to stay in the homes of other members. Doc. 64-1 at 66–88; Doc. 64-3 at 32–34. Plaintiff Williams testified that he received what he was promised as a Founders Circle member and enjoyed the travel afforded to him through this membership. Doc. 64-3 at 33. Arona received the benefits of being a Founders Circle member having taken 37 trips in which he stayed at 3HL members' homes through August 2021, including at St. Regis, Ritz-Carlton, Waldorf Astoria, Park City, and Rosemary Beach, Florida. Doc. 64-1 at 89–90.

The Subscription Agreements, signed by Plaintiffs in conjunction with the stock purchases, contained certain representations, including that the subscriber acknowledges and is fully aware that the shares are a speculative investment that involves a high degree of risk of loss by the subscriber of the entire investment in 3HL; there will be no public market for the 3HL shares; there is no guarantee the subscriber will ever be able to sell the shares or otherwise liquidate his investment in 3HL; and there is no guarantee of profit or that the subscriber will receive a distribution from 3HL. *See, e.g.,* Doc. 64-2 at 3–4.  In total, Arona signed six Subscription Agreements dated 2012 to 2019 (Doc. 64-2 at 1–7, 30–52, 76–90). Williams signed multiple Subscription Agreements and one Transfer of Shares over a 4-year period (Doc. 64-4 at 8–16, 41–47, 49, 51–57, 83–89).

Details of the Plaintiffs' investments are as follows:

Plaintiff Arona:

| Date | Number of Shares Purchased | Amount Invested | Price Per Share |
|------|----------------------------|-----------------|-----------------|
| 01/02/13[4] | 50,000 | $25,000 | $.50 |
| 01/07/14 | 50,000 | $25,000 | $.50 |
| 06/16/14 | 50,000 | $25,000 | $.50 |
| 10/22/15 | 50,000 | $62,500 | $1.25 |
| 08/13/17 | 50,000 | $87,500 | $1.75 |
| 03/15/19 | 25,000 | $50,000 | $2.00 |

Plaintiff Williams:[5]

---

[4] Plaintiff Arona signed his first Subscription Agreement on December 17, 2012, for the purchase of 50,000 shares at fifty cents per share (Doc. 64-2 at 1–7); it was not documented in 3HL's books until January 2, 2013. Doc. 64-1 at 59–60.

[5] The Court refers to the purchases as Williams's, as that is what the parties stipulated to. *See* Doc. 70 ¶ 14. The Subscription Agreements identify the purchaser as the John I. Williams, Jr. Revocable Trust ("Trust").  In his deposition, filed in conjunction with the Defendants' motion for summary judgment, Williams testifies that the shares were purchased in the name of the Trust and that the Trust has not assigned this claim to Williams personally. Doc. 64-3

| Date | Number of Shares Purchased | Amount Invested | Price Per Share |
|------|---------------------------|-----------------|-----------------|
| 05/28/13 | 100,000 | $50,000 | $.50 |
| 06/17/14 | 450,000 | $225,000 | $.50 |
| 09/22/14 | 400,000 | $200,000 | $.50 |
| 08/25/17 | 150,000 | $262,500 | $1.75 |

Doc. 70 ¶ 14. With each purchase of stock, Plaintiffs received "keys" to use the vacation homes in the 3HL inventory without having to own a second home or, alternatively, without having to offer weeks in their second home to other 3HL members. Doc. 64-1 at 85–88.

With each purchase of non-voting shares, Arona and Williams received a Subscription Agreement. *See* (Doc. 64-2 at 1–7, 30–52, 76–90; Doc. 64-4 at 8–14, 41–47, 51–57, 83–89). In pertinent part, the Agreements state:

> The Subscriber acknowledges and is fully aware of the following:
>
> (i) The Share are a speculative investment that involves a high degree of risk of loss by the Subscriber of the entire investment in the Company.
> . . .
> (iv) None of the following has been represented, guaranteed, or warranted to the Subscriber by the Company, its officers, agents or employees, or any other persons, expressly or by implication:
>> (A) that the Subscriber will ever be able to sell or otherwise liquidate this investment in the Company;
>> (B) that there is any guarantee or assurance that any percentage of profit and/or amount of or type of consideration, profit or loss (including tax write offs and/or tax benefits) will be realized as a result of an investment in the Company; or
>> (C) that the Subscriber will ever receive distributions from the Company.

---

at 41. In Williams' response to the Order to Show Cause and his affidavit, filed September 15, 2023, he acknowledges the Trust is the 3HL shareholder. Doc. 85.

Doc. 64-2 at 3–4. The signed Subscription Agreements expressly referenced and incorporated a Private Placement Memorandum. Doc. 70 ¶ 13.

The Private Placement Memorandum included, among other details, the following information that Plaintiffs acknowledged:

> a. That the investment involved a high degree of risk and that investors should purchase shares only if they can afford a complete loss of their investment;
> b. That no person had been authorized by 3HL to give any information or make any representations (verbal or otherwise) beyond those contained in the Subscription Agreement or the Private Placement Memorandum.

*See* Doc. 64-2 at 57–59.

Arona testified that none of the documents promised a stock dividend, none of the documents state the company is looking to be acquired, and none promise or guarantee that the company will be converted to a publicly-traded company. Doc. 64-1 at 52–53. Williams similarly testified that he signed the agreements knowing he was not entitled to a dividend. Doc. 64-3 at 100. He acknowledged the agreements he signed never guaranteed that 3HL would be acquired by a larger company or that 3HL, a privately held company, would ever become a publicly traded company through an initial public offering (IPO). *Id.* at 100–01.

Arona testified that the quality of homes available through 3HL are good properties. Doc. 64-1 at 84-85. He has no facts to support that a home offered on the 3HL website does not exist. Doc. 64-1 at 98.

Upon formation, 3HL had three Board Members: Wade Shealy, Giles Adams, and Jerry Beck. Doc. 70 ¶ 15. On December 11, 2018, Beck received an email from Shealy with a resolution of the shareholders, signed by Shealy as the 100% holder of

voting shares, removing Beck from his position as director. Doc. 1-1 ¶¶ 46, 47; Doc.
44 ¶¶ 46, 47. In 2019, 3HL expanded its Board to five members. Doc. 70 ¶ 16. The
current Board Members are as follows: Wade Shealy, Giles Adams, Daniel Raidt,
Stephen Kircher; and Kristen Southey. *Id.*

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, show there is no
genuine issue as to any material fact and that the moving party is entitled to judgment
as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986). The moving party bears the initial burden of stating the basis for its motion and
identifying those portions of the record demonstrating the absence of genuine issues of
material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256,
1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show
the court that there is "an absence of evidence to support the nonmoving party's case."
*Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must
then designate specific facts showing that there is a genuine issue of material fact. *Id.*
at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence
present, could find for the nonmoving party," and a fact is "material" if it may affect
the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

B.   **Applicable Law**

Defendants submit that the Court should apply the laws of Tennessee, where 3HL maintains its executive offices or, alternatively, the laws of Delaware as 3HL was domesticated as a Delaware corporation in 2019, before this action was filed. Doc. 63 at 15. Plaintiffs argue that Florida law governs because it has the most significant relationship to the dispute. Doc. 69 at 14–15.

In diversity actions such as this one, the Court is required to apply the substantive law of the forum state, including its choice of law rules. *Klaxon Co. v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Under Florida law, a court makes a separate choice of law determination with respect to each claim under consideration and must characterize the legal issue and determine whether it sounds in tort, contracts, property law, or some other area of the law. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp.*, 485 F.3d 1233, 1240 (11th Cir. 2007). "Once it has characterized the legal issue, it determines the choice of law rule that the forum state applies to that particular type of issue." *Id.* (citation omitted).

The fiduciary duties that an officer or director owes to a corporation concern the internal affairs of the corporation. *See Edgar v. MITE Corp.*, 457 U.S. 624, 645

9

(1982) ("matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders" are a corporation's internal affairs). Under Florida law, "[c]laims involving 'internal affairs' of corporations . . . are subject to the laws of the state of incorporation." *Chatlos Found., Inc. v. D'Arata*, 882 So. 2d 1021, 1023 (Fla. 5th DCA 2004) (citation omitted); *see also* Fla. Stat. § 607.15015(1)(a) ("The law of the state or other jurisdiction under which a foreign corporation exists governs (a) The organization and internal affairs of the foreign corporation . . . .").

For claims involving corporations and their officers and directors, both the Eleventh Circuit and Florida courts have further analyzed choice of law questions by looking to the sections of the Restatement that address those particular claims. *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989). Pursuant to § 309 in the Restatement (Second) of Conflicts of Laws, the law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders. "The local law of some state other than that of incorporation should not be applied to determine such issues unless this other state has an interest that is superior to that of all other states in the issue to be decided." Restatement (Second) of Conflict of Laws § 309 (1971); *see Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1133 (11th Cir. 2020) ("The internal affairs doctrine instructs that 'the extent and nature of [the] relationship between . . . corporate officer or director and stockholder . . . should be governed by the laws of the state of incorporation.""); *Select Portfolio Serv'g, Inc. v. Evaluation Solutions, L.L.C.*, 2006 WL

10

2691784 (M.D. Fla. 2006) ("Under the internal affairs doctrine [citing *Chatlos*], the law of the state of incorporation normally controls the affairs internal to the corporation.").

Under Florida's choice of law rules, the Court will apply the laws of Delaware, which is the state of incorporation of 3HL. Plaintiff acknowledges "that only one State should have the authority to regulate a corporation's internal affairs." Doc. 69 (citing *Edgar v. Mite Corp.*, 457 U.S. 624, 645 (1982)). As 3HL is a Delaware corporation, that state is Delaware. However, Plaintiffs argue this doctrine may be rebutted where the forum state has an overriding interest in applying its own laws. In support of their position, Plaintiffs submit that Florida has significant connections to the dispute, including Defendants' solicitation and marketing of its business in Florida; corporate emails sent to investors in Florida, including Williams; and 3HL's registration to do business in Florida. Further, Plaintiffs argue Delaware has no real connection to the dispute other than the domestication of 3HL in Delaware. Suffice it to say, many corporations that are incorporated in Delaware and that are governed by Delaware law nevertheless are located outside Delaware and have connections to other states. Additionally, although Williams is a Florida resident, Arona is a Georgia resident. Doc. 1-1 ¶¶ 1, 3. Arona likely received corporate emails and marketing materials in Georgia. And there are 213 other shareholders to whom marketing materials were sent who received corporate emails in their state of residence. It is not enough for another state to have a connection to the dispute; the interest of the other state must be overriding. On the facts before the Court, the evidence does not demonstrate that

11

Florida has a superior interest to all other states on the issues to be decided.[6] Accordingly, the laws of Delaware—the state in which 3HL is incorporated—will be applied to the issues before the Court on the Plaintiffs' breach of fiduciary duty claim.

## III.   DISCUSSION

Plaintiffs sue Defendants in a three-count complaint seeking (1) to wind up 3HL under Grand Cayman law, specifically Section 95, Companies Law (2020); (2) for breach of fiduciary duty against Shealy; and (3) for the appointment of a receiver or custodian over 3HL. Before addressing the three claims, the Court must address the ability of Plaintiff, Johnathan Williams, to sue in his individual capacity.

### A.   Johnathan Williams

#### 1.   Standing

A federal court has the obligation to review *sua sponte* whether it has subject matter jurisdiction under Article III's case-or-controversy requirement. *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003) (citing *Juidice v. Vail*, 430 U.S. 327, 331 (1977)). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). In general, a party's standing is determined at the time a complaint is filed. *See Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-CV-947-PAM-JBT,

---

[6] As an alternative to Delaware law, Defendants suggest Tennessee law would apply, but other than arguing that Tennessee is the state in which the company is operationally based, Defendants have not provided evidence that Tennessee is superior to all other states on the issues to be decided.

2009 WL 10671129, at *3 (M.D. Fla. July 24, 2009) (collecting cases). Williams'
response to the Court's Order to Show Cause does not directly address the Court's
inquiry regarding Article III standing. However, his affidavit attests that he is the
settlor, Trustee, and sole beneficiary of the express Trust. Doc. 85 at 9–10. He bears
full control of the Trust assets, has the authority to revoke the Trust, and may instruct
that the Trust assets be distributed to him at any time. *Id.* Thus, he states that he is the
one with the personal stake in the 3HL shares of the Trust. *Id.* at 10. On these facts,
Plaintiff Williams identifies a potential concrete, particularized and actual harm to
himself, should a breach of fiduciary duty be shown, to establish his constitutional
standing.

## 2. *Real Party in Interest*

Distinct from the issue of constitutional standing is the real-party-in-interest
requirement of Fed. R. Civ. P. 17(a)(1) that provides "[a]n action must be prosecuted
in the name of the real party in interest." This rule requires that an action be brought
by "the party who, by the substantive law, has the right sought to be enforced[.]"
*Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 256-57 (5th Cir. 1980);[7]
*see also United States v. 936.71 Acres of Land*, 418 F.2d 551, 556 (5th Cir. 1969) ("The
'real party in interest' is the party who, by substantive law, possesses the right sought
to be enforced, and not necessarily the person who will ultimately benefit from the

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh
Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down
prior to the close of business on September 30, 1981.

recovery.") (quotation omitted). The purpose of the real-party-in-interest rule is "to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as *res judicata*." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1080 (11th Cir. 2003) (quotation omitted). Because the rule is for the benefit of the defendant and is not jurisdictional, it may be deemed waived. *See id.* (citations omitted).

Plaintiff Williams initially argues that as the sole beneficiary under the Trust, he is the real party in interest. Williams submits he may bring the suit in his own name as he is a settlor under Florida law and thus the claims are appropriately brought in his individual name. Alternatively, he requests leave to amend his Complaint to bring the action in the name of the Trustee on behalf of the Trust.

As Williams' testimony reflects, he is not the shareholder and does not individually hold an assignment of the claims in this action. Moreover, he fails to address Delaware law's mandate that a "derivative shareholder must not only be a stockholder at the time of the alleged wrong and at the time of commencement of suit but that he must also maintain shareholder status throughout the litigation." *Lewis v. Ward*, 852 A.2d 896 (Del. 2004). Even if a claim by a shareholder could be made on the facts here, as is more fully discussed below, Johnathan Williams, individually, was never a 3HL shareholder and thus does not possess a substantive right under Delaware law to enforce any such claim.

As an alternative, Plaintiff seeks leave to amend his Complaint under Rule 17(a)(3) to name himself, in his capacity as Trustee, as the named Plaintiff. The

Plaintiff's request to amend is due to be denied. This case has been pending for over three years. The amendment that Plaintiff seeks to make to his Complaint was known by Plaintiff Williams (and the Defendants) *since 2013* when the John I. Williams, Jr. Revocable Trust first purchased 3HL shares. The Eleventh Circuit has observed that "most courts have interpreted . . . Rule 17(a) as being applicable only when the plaintiff brought the action [in the name of the wrong party] as a result of an understandable mistake, because the determination of the correct party to bring the action is difficult." *In re Engle Cases*, 767 F.3d 1082, 1109 (11th Cir. 2014) (quoting *Wieburg v. GTE Sw. Inc.,* 272 F.3d 302, 308 (5th Cir. 2001)); *see also* 6A Wright & Miller, *Federal Practice and Procedure*, § 1555 (3d ed. 2010) ("[I]t has been held that when the determination of the right party to bring the action was not difficult and when no excusable mistake had been made, then Rule 17(a)(3) is not applicable and the action should be dismissed."). The record before the Court does not reflect that an "understandable" or "excusable" mistake was made or that it was difficult to ascertain the correct party. That said, given that Defendants have never raised the issue that Williams was not the real party in interest, the argument has been waived. *See Steger,* 318 F.3d at 1080; *see also Riggins v. Polk Cty.*, No. 8:12-CV-1755, 2014 WL 3900266, at *1 (M.D. Fla. Aug. 8, 2014), aff'd, 602 F. App'x 765 (11th Cir. 2015) ("Whether a party is the real party in interest is a waivable issue; however, standing is not an issue that can be waived."); *VCA Cenvet, Inc. v. Vill. Veterinary Ctrs., Inc.*, No. 1:11-cv-3119, 2012 WL 3779101, at *5 (N.D. Ga. Aug. 31, 2012) ("Unlike standing, an objection that a plaintiff is not the real party in

interest may be waived and should be asserted by the objecting party reasonably promptly.").

Moreover, considering Plaintiff's request under Rule 15(a)'s liberal standard for amendments, the motion is still due to be denied. Waiting over three years to request leave to amend a complaint with facts known at the time of filing the complaint, when the request is made after the close of discovery and after the filing of dispositive motions, constitutes undue delay. Finally, even if the Court were inclined to allow leave to amend, "the denial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999). As discussed below, Defendants are entitled to summary judgment in their favor on the claims in the Complaint. Thus, any amendment to the complaint to name Plaintiff in his capacity as Trustee, instead of Williams individually, would be futile as it would not change the end result for Johnathan Williams and the Trust. As Defendants have waived any defense that Williams is not the real party in interest, the Court addresses the merits of Plaintiffs' claims.

### B.   Breach of Fiduciary Duty (Count II)

Count II of the Complaint seeks to hold Defendant Shealy liable for breach of fiduciary duty. Plaintiffs allege that Shealy had a duty to make decisions in the best interest of the members of 3HL, including Plaintiffs. Plaintiffs assert that Shealy breached that duty by mismanaging 3HL employees, spending excessively on marketing with insufficient return on investment, misrepresenting the number of homes available to members, giving himself massive raises while 3HL cannot make a

16

profit, issuing forged resolutions, keeping his shares' sales secret from the other Directors, selling his own shares without Director approval, selling his own shares when he should have sold company shares to raise capital, and removing Beck as a Director when Beck questioned Shealy's management. Doc. 1-1 ¶ 79. Plaintiffs allege that they have been damaged by Shealy's alleged breaches of fiduciary duty and seek damages as a result. *Id.* ¶ 80.

### 1. Derivative or Direct

As a preliminary matter, Defendants characterize Plaintiffs' claims as derivative although not labeled as such. "A derivative suit is brought by shareholders to enforce a claim on behalf of the corporation." *Burks v. Lasker*, 441 U.S. 471, 477 (1979). In response, Plaintiffs argue they never identified their claims as "derivative."[8] The Eleventh Circuit has explained, however, that "[d]etermining whether a claim is direct or derivative does not depend on the label given by the plaintiff; instead, such a determination depends on the nature of the claims raised in the complaint." *Freedman*, 963 F.3d at 1136.

---

[8] Notwithstanding Plaintiffs' argument, they do not offer any legal authority to support that their claims are direct. Moreover, Plaintiffs' analysis continues as if their claims are derivative, citing to both Florida and Delaware law, arguing that even if Plaintiffs are asserting a derivative claim, they need not first make a demand on the board of directors when such demand would be futile and when fraud is alleged. Doc. 69 at 17. Plaintiffs' Complaint fails to allege a demand was made or that demand would be futile. Doc. 1-1. Additionally, Plaintiffs argue that because they also sue 3HL, their claims could not be brought on the entity's behalf where they are suing the entity. Doc. 69 at 16 n. 14. This argument is unavailing because the claims for breach of fiduciary duty are brought against Shealy only, not 3HL. Doc. 1-1.

Pursuant to Delaware law, in determining whether an action is a direct or derivative claim, the issue turns on two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).[9] To support a direct claim, "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.* at 1039.

Review of Plaintiffs' Complaint reveals they allege they suffered the same injuries as other shareholders. *See, e.g.,* Doc. 1-1 ¶ 34 (alleging Shealy used invested funds for his own personal gain "to the detriment of the members, including [Plaintiffs]"); ¶ 36 (alleging only 3000 to 5000 homes available to members despite misrepresentations of over 11,500 luxury homes in inventory); ¶ 38 (alleging Shealy consistently wasted assets and exposed 3HL to liabilities); ¶ 52 (alleging significant financial strain "Shealy has imposed on Third Home and its members/investors, including [Plaintiffs]"). Plaintiffs' allegations constitute classic claims of asset

---

[9] "Florida law similarly limits when a shareholder action may be brought directly, as opposed to derivatively, against a corporation. A direct action may be maintained only where (1) there is a direct harm to the shareholder or member such that the alleged injury does not flow subsequently from an initial harm to the company, and (2) there is a special injury to the shareholder or member that is separate and distinct from those sustained by the other shareholders or members." *Freedman*, 963 F.3d at 1136 (citation and internal quotations marks omitted).

mismanagement, devaluation of shareholder stock, and damage to the corporation that are indicative of a derivative action, as opposed to independent injury flowing only to Plaintiffs. *See, e.g., Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) (holding claim of mismanagement that resulted in corporate waste, if proven, "represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature."); *Cirillo Fam. Tr. v. Moezinia*, No. CV 10116-CB, 2018 WL 3388398, at *16 (Del. Ch. July 11, 2018), aff'd, 220 A.3d 912 (Del. 2019) (internal citations and quotations omitted) (observing that dilution claims are typically viewed as derivative under Delaware law because "the alleged injury falls upon all shareholders equally and falls upon the individual shareholder in relation to his proportionate share of stock as a result of the direct injury being done to the corporation").Thus, on the facts in evidence in this case, the Plaintiffs' claims are derivative and will be analyzed as such. Significantly, where a claim is derivative, the recovery, if any, flows only to the corporation. *Tooley*, Inc., 845 A.2d at 1036. Thus, any claim of individual recovery by Plaintiffs is precluded as a matter of law.

### 2.     Demand to Board of Directors

"The business and affairs of a Delaware corporation, absent exceptional circumstances, are to be managed by its board of directors." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 984 (Del. Ch. 2007). As such, "a plaintiff who initiates a derivative action must before the commencement of the action either demand that

the corporate board take up the litigation itself or, in the alternative, demonstrate in a complaint why such a demand would be futile." *Id.* at 984–85. Defendants submit that there is no evidence that a demand has been made here and thus Plaintiffs' claims must fail. Plaintiffs respond that this is the first instance in which Defendants raise the issue of demand, and regardless, demand is not required where it would be useless or in which fraud is alleged. Plaintiffs submit they are excused from making a futile demand where Shealy, who has 100% managerial control, would be the one deciding whether to institute a lawsuit against himself.

Generally, under Delaware law, the proper entity to bring an action against a corporation for alleged mismanagement is the company's board of directors, and an individual shareholder is precluded from instituting their own derivative lawsuit absent a demand by the shareholder to the board to pursue the claims on its own behalf. *See* Del. Ch. Ct. R. 23.1 (Delaware Chancery Court Rule 23.1 requires a complaint to allege a plaintiff's efforts, if any, to first obtain action from the directors or explain the plaintiff's failure to obtain the action or for not making the effort.). Federal Rule of Civil Procedure 23.1 similarly requires "a shareholder bringing a derivative suit file a verified complaint that states with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not

obtaining the action or not making the effort." *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1143 (Del. 2011) (citing Fed. R. Civ. P. 23.1(b)(3)).[10]

In addition to Plaintiffs failing to make a demand or otherwise alleging why demand would be futile, Defendants complain that Plaintiffs did not verify their Complaint. Defendants are correct that the Complaint is neither verified nor includes allegations regarding demand or the futility of demand. *See* Doc. 1-1. On the first argument regarding a verified complaint, Plaintiffs have now filed Affidavits verifying that Plaintiffs "believe" the allegations contained in the Complaint are true and correct. Docs. 69-1, 69-2. Plaintiffs offer no explanation as to why the Complaint was not initially verified or why there was no allegation of futility. Defendants urge the Court to reject Plaintiffs' eleventh-hour affidavits that contradict their sworn testimony that they did not have evidence to support their claims. Doc. 71 at 3; *see, e.g.,* Doc. 64-1 at 129, 144–47 (Arona's testimony that he has no independent knowledge or evidence that Shealy used 3HL funds improperly for tuition, travel or stock buybacks, nor does he have first-hand knowledge or evidence that Shealy made irrational decisions regarding hiring, treatment of employees, or harassment of employees); Doc. 64-3 at 119–21 (Williams' testimony he has no personal knowledge and cannot refute 3HL's assertion that it never paid for tuition for Shealy or his loved ones).

---

[10] Additionally, Rule 23.1 provides that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association. Fed. R. Civ. P. 23.1(a). There is no evidence before the Court that Plaintiffs represent the interests of the other 213 shareholders.

In general, "[a] court may determine that an affidavit is a sham when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction." *Kilgore v. Trussville Dev., LLC*, 646 F. App'x 765, 771 (11th Cir. 2016) (citing *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010)).  At a minimum, it appears Plaintiffs' affidavits are, at least in part, inconsistent with their sworn testimony. Even if the Court could rely on the late-filed declarations, however, the Plaintiffs must still establish that demand would have been futile.

This second argument, requiring a demand to the board of directors, proves more problematic for Plaintiffs. Indisputably, there are no allegations or evidence that a demand was made to the board of directors to bring the claims. Nor is there any allegation describing why demand was unnecessary due to futility. Under Delaware law, a shareholder demand is a condition precedent to a shareholder's right to institute their own derivative lawsuit on behalf of the company. *See Brehm v. Eisner*, 746 A. 2d 244 (Del. 2000). In their response to Defendants' motion, Plaintiffs first argue that Defendants never previously raised the issue of demand. But Plaintiffs do not direct the Court to any Delaware case law demonstrating a failure to raise the issue earlier constitutes a waiver of the defense. Plaintiffs next contend that demand would be futile because Shealy holds all the voting stock. The parties agree, however, that Shealy's control is only as it pertains to matters not subject to a vote of the Board. Doc. 1-1 ¶ 28; Doc. 44 ¶ 28. Plaintiffs' claim that the Board would have rejected a demand to bring a claim on behalf of shareholders is speculative as Plaintiffs have proffered no

evidence regarding their efforts to make a demand or regarding the other four directors.

The Certificate of Corporation for 3HL provides:

> The business and affairs of the Corporation are to be managed by or under the direction of the Board of Directors. In addition to the powers and authority expressly conferred upon them by statute or by this Certificate of Incorporation or the By-Laws, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

Doc. 64-10 at 115. Delaware law confers on a company's board of directors the right to initiate a lawsuit. *See Freedman v. Redstone*, 753 F.3d 416, 424 (3d Cir. 2014) ("The decision whether to bring a lawsuit is a decision concerning the management of the corporation and consequently is the responsibility of the directors." (internal quotation marks and citations omitted)). In general, "directors are entitled to a presumption that they were faithful to their fiduciary duties, and a plaintiff bears the burden of overcoming this presumption." *Id.* Plaintiffs have failed to do so here as Plaintiffs offer no evidence regarding the other four directors.

In *United Food & Commercial Workers Union & Participating Food Industry Employers. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021), the Supreme Court of Delaware recently articulated the three-part test adopted "as the universal test" for courts to apply in determining whether a plaintiff's demand is excused as futile. Under *Zuckerberg*, courts are to ask the following on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Id.* "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.* This test was recently recognized and applied by the Eleventh Circuit, as well, in *Whitten v. Clarke*, 41 F.4th 1340, 1349 (11th Cir. 2022).

As of 2019, the year prior to Plaintiffs instituting this lawsuit, 3HL had five directors, one of which was Shealy. Under the *Zuckerberg* test, the Court is to consider demand futility on a director-by-director basis, but Plaintiffs wholly fail to proffer any evidence or testimony regarding four of the five directors to allow the Court to undertake a director-by-director analysis as discussed by the *Zuckerberg* Court. Thus, on the record before the Court, Plaintiffs fail to demonstrate demand would have been futile. Therefore, Plaintiffs' claims fail due to Plaintiffs' failure to make a demand on the 3HL Board of Directors or to otherwise demonstrate that demand would have been futile. Even if Plaintiffs could establish here that demand would have been futile, however, the breach of fiduciary duty claim against Shealy nevertheless fails. There is no disputed issue of fact in the record before the Court that the business judgment rule governs the conduct complained of and Plaintiffs fail to create an issue of fact that the actions of Shealy were not the product of a valid exercise of business judgment.

24

### 3. Business Judgment Rule

To determine whether directors have complied with their fiduciary duties, Delaware courts evaluate director decision-making using one of the following standards: the business judgment rule, enhanced scrutiny, and entire fairness. *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 684 (Del. Ch. 2023) (citing *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)). "Delaware's default standard of review is the business judgment rule. That standard of review presumes that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d at 685 (citations omitted). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *Id.* "An application of the traditional business judgment rule places the burden on the 'party challenging the [board's] decision to establish facts rebutting the presumption.' If the business judgment rule is not rebutted, a 'court will not substitute its judgment for that of the board if the [board's] decision can be 'attributed to any rational business purpose.'" *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1373 (Del. 1995) (internal citations omitted).

Plaintiffs raise numerous complaints regarding Shealy's alleged breaches. They primarily rely on the statements of Jerry Beck. But as discussed below, the conduct complained of constitutes classic business judgment for which the Court should not

substitute its judgment for that of the directors. Plaintiffs fail to proffer evidence of fraud or bad faith by Shealy to avoid application of the business judgment rule.

### Removal of Beck as Board Member

Plaintiffs complain that Shealy removed Jerry Beck as a board member. Regarding removal of directors or CEOs, courts defer to the directors' decision under the business judgment rule. *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d at 691 (holding "decision to terminate Easterbrook without cause was a classic business judgment").

### Marketing Expenditures

Plaintiffs complain Shealy wasted corporate funds through excessive marketing expenditures. Under Delaware law, a company has the power to conduct its own business, *see* Del. Code tit. 8, § 141(a) ("business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors"), including promoting the company, *see id.* § 121(a). Moreover, the evidence reflects that Arona sent an email praising the marketing and new properties coming online (Doc. 64-1 at 114), notwithstanding the Complaint's allegations of misconduct in the purchase of excessive marketing. He acknowledges that 3HL's marketing expenditures went from $637,000 in the first quarter of 2019 to $176,000 in the first quarter of 2020. *Id.* at 123.  By the end of 2020, marketing and promotion expenses went down even more. *Id.* at 128. The evidence reveals that Shealy did not make marketing decisions unilaterally, but rather such decisions were made by consensus of the executive team, which was a collaborative process. Doc. 64-5 at 286–88.

*Compensation to Shealy*

Plaintiffs complain that Shealy gave himself massive raises. Delaware law protects a company's power to conduct its business, including setting director compensation, *see* Del. Code tit. 8, § 141(h) ("the board of directors shall have the authority to fix the compensation of directors"). The evidence reflects Shealy's compensation was $0 in years 2010 and 2011. Doc. 64-8 at 260. It was not until 2012, that he began taking a salary and was paid $223,578. *Id.* His salary increased by approximately $50,000 from 2012 to 2013 and again from 2013 to 2014. *Id.* His salary decreased in 2015 to $255,572. *Id.* While his salary increased the next three years: 2016 $301,000; 2017 $322,500; 2018 $442,500, it decreased in 2019 to $413,000 and again in 2020 to $359,531. *Id.*

*Shealy's Use of 3HL Funds for Travel for Others and Tuition*

Plaintiffs complain Shealy misused 3HL funds for his own personal benefit or that of his family. Regarding this claim, Plaintiffs assert that Shealy used 3HL funds for personal expenses such as tuition and travel for others, but both Plaintiffs testified that they have no evidence to support these allegations. Doc. 64-1 at 144–45; Doc. 64-3 at 116. In contrast, Chief Financial Officer Daniel Raidt denied that Shealy ever used 3HL funds to pay for tuition for his family's benefit or for unauthorized travel expenses. Doc. 64-5 at 283–84. Similarly, Shealy testified that 3HL funds were never used to pay for his personal travel expenses or for tuition expenses for himself, friends or family members. Doc. 64-9 at 291–92.

*Alleged Employee Mistreatment*

Plaintiffs assert that under Shealy's management, 3HL employees were mismanaged in that he improperly hired, fired and mistreated employees. Shealy testified that, other than one EEOC complaint in which the company ultimately prevailed, there have been zero lawsuits or EEOC complaints filed by employees against 3HL. Doc. 64-9 at 292. When asked in deposition, Arona could not identify who was the subject of alleged improper hiring, treatment or harassment by 3HL. Doc. 64-1 at 27. He could not refute the company's position that there was only one EEOC complaint filed against 3HL and 3HL prevailed. *Id.* at 29. Williams similarly could not identify any 3HL employees improperly hired or treated poorly due to corporate mismanagement. He could not identify any 3HL employees that allegedly suffered harassment due to management. Doc. 64-3 at 21. He was not aware of any employee that filed an EEOC complaint against 3HL. *Id.* at 24.

*Buying Back Shares in 3rd Home at Inflated Value and Transfers of Shares*

Plaintiffs complain that Shealy forged resolutions for the sale of his personal stock and that Shealy sold his personal stock when 3HL was trying to raise money through a capital campaign. Evidence shows that Shealy never signed any agreement that limited his ability to sell or transfer his stock, nor did he sign any statement that he would not sell his stock. Doc. 64-9 at 288. The original shareholders, including Giles Adams and Jerry Beck, also were not prohibited from selling their shares, unlike the traditional stock subscription agreements signed by Plaintiffs and other subsequent shareholders through fundraising campaigns, whose stock transfers were limited. *Id.*

at 289–91. In fact, Williams bought stock directly from Giles Adams, who was a board member at the time. Doc. 64-3 at 56–57. Regarding Plaintiffs' claims of fraudulent resolutions, the record evidence shows that the use of electronic signatures was the same protocol followed for earlier sales of stock by both Beck and Adams. Doc. 64-5 at 278–80. Plaintiffs fail to cite evidence that any of the stock sales harmed the company or the Plaintiffs. In contrast, Raidt testified that stock that was bought back and re-sold was sold at either the same or higher price and created no financial hardship on 3HL. Doc. 64-5 at 291.

In sum, Plaintiffs fail to demonstrate fraud or that a disputed issue of fact exists as to the alleged breaches of fiduciary duty. Because no disputed issue of fact exists, Defendant Shealy is entitled to summary judgment as to the breach of fiduciary claim against him.

The Court notes that Delaware statutory law specifically allows a corporation to limit the liability of a director or officer. In pertinent part, Section 102 of the Delaware Code provides, "the certificate of incorporation may also contain . . . [a] provision eliminating or limiting the personal liability of a director or officer to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director or officer." Del. Code tit. 8, § 102(b)(7);[11] *see also Chen v. Howard-Anderson*, 87 A.3d 648, 676 (Del. Ch. 2014) ("an exculpatory provision shields the directors from

---

[11] This provision does not apply if it seeks to limit the liability of a director for the director's acts or omission not made in good faith or which involve intentional misconduct or a knowing violation of law or for any transaction from which the director derives an improper benefit. *See id.* § 102(b)(7)(ii), (iv).

personal liability for monetary damages for a breach of fiduciary duty, except liability for the four categories listed in Section 102(b)(7)"). 3HL's Certificate of Corporation provides that "[a] director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the [General Corporation Law of the State of Delaware]." Doc. 64-10 at 115. Plaintiffs' unsubstantiated claims of fraud do not overcome this provision.

### C.  Wind up of Corporation (Count I)

Plaintiffs seek to wind up 3HL due to Shealy's alleged fraud, misconduct, and mismanagement of 3HL. Doc. 1-1 at 10–13. In their Complaint, Plaintiffs seek to wind up the corporate Defendant under Cayman Islands Law. Neither party now claims that Cayman Islands law applies. Thus, the Court directed the parties to submit supplemental briefing regarding the Court's jurisdiction to "wind up" 3HL. Doc. 75. In response, Defendants argue Cayman Law does not apply, and even if it did, the Grand Court of the Caymans would have exclusive jurisdiction to wind down a corporation under Cayman law.  Defendants further contend Delaware law applies to 3HL, a Delaware corporation, and Delaware law does not permit involuntary dissolution of a corporation by way of a shareholder lawsuit. Even if such argument could be made that 3HL could be dissolved under Delaware law, Defendants submit that such matters are more appropriately left for the Delaware courts.

For their part, Plaintiffs argue that the Court accepted jurisdiction of this case, and specifically Count I's request to wind up 3HL, when it denied Defendants' motion

to dismiss the claim in the first instance.  Plaintiffs next argue that even though Cayman Islands Law does not apply, the Court has the authority to issue appropriate equitable relief, including the power to "wind up" 3HL regardless of its domestication in Delaware, particularly where Defendants demonstrate no substantial ties to the state of Delaware.

As a preliminary matter, in denying Defendants' motion to dismiss, the Court was constrained to accept as true the facts in the Complaint as alleged by Plaintiffs. On the instant motion, however, the Court has the benefit of a more fully developed record, and it is now apparent, as explained by Defendants, that there is only one 3rd Home entity: a Delaware corporation, which is the successor of a prior Cayman Islands company. Doc. 81 at 1. Nothing in the record before the Court refutes this. Thus, Cayman Islands Law would not apply to this Delaware corporation to wind it up or otherwise provide any remedy.

To the extent that the Court considers Plaintiffs' request to "wind up" 3HL under any applicable law, the request is rejected for multiple reasons. First, Count I requests a winding up under Cayman Islands law and Plaintiffs have never sought leave to amend their pleadings to request dissolution under any other law. Even if they were permitted to amend Count I, however, Plaintiffs' claim would still fail. While Florida law may permit involuntary dissolution,[12] Delaware law generally does not,

---

[12] Under Florida law, a court may dissolve a corporation or order other remedy, including appointment of a receiver, in a proceeding by a shareholder if it is established that "[t]he corporate assets are being misapplied or wasted, causing material injury to the corporation; or . . . [t]he directors or those in control of the corporation have acted, are acting, or are

and the Court has already determined Delaware law governs this Delaware corporation.

Generally, under Delaware law, dissolution occurs either by unanimous vote of all shareholders entitled to vote or by majority vote of the Board of Directors. *See* Del. Code tit. 8 § 275. Alternatively, involuntary dissolution can occur if sought by Delaware's Attorney General or by one person in a two-person venture. Del. Code tit. 8, § 284(a); § 273. Significantly, the "Court of Chancery shall have jurisdiction of any application prescribed in [Title 8]." Del. Code tit. 8, § 283. Supreme Court precedent supports that such matters are best resolved by the Courts in the state of incorporation in the first instance. *See Rogers v. Guar. Tr. Co. of New York*, 288 U.S. 123, 130 (1933) (as a general rule, corporations organized under the laws of another state will leave controversies as to such matters to the courts of the state of the domicile). Even if the Court found it appropriate to consider Plaintiffs' request to wind up 3HL under Delaware law, Plaintiffs have wholly failed to cite statutory authority to support their demand or to otherwise proffer evidence of fraud, misconduct, and/or mismanagement of 3HL by Shealy. Thus, Defendants are entitled to summary judgment on Count I of the Complaint seeking to wind up 3HL under Section 95 Companies Law (2020) of the Cayman Islands.

---

reasonably expected to act in a manner that is illegal or fraudulent." Fla. Stat. § 607.1430(1)(b)(3), and (4).

### D.    Appointment of Receiver (Count III)

Without citing to any legal authority to support the requested relief, Plaintiffs seek the appointment of a receiver or custodian over 3HL in Count III. Doc. 1-1 at 14–15. In their response to Defendants' motion for summary judgment, Plaintiffs suggest that the appointment of a receiver is appropriate under either Florida or Delaware law. As the Court has determined that Florida law does not apply to this dispute regarding a Delaware corporation, the Court looks to Delaware law.

Section 279 of Title 8 of the Delaware Code addresses the appointment of a trustee or receiver for dissolved corporations. "When any corporation organized under this chapter shall be dissolved in any manner whatever, the Court of Chancery, on application of any creditor, stockholder or director of the corporation, or any other person who shows good cause therefor, at any time, may either appoint 1 or more of the directors of the corporation to be trustees, or appoint 1 or more persons to be receivers, of and for the corporation, to take charge of the corporation's property, and to collect the debts and property due and belonging to the corporation . . . ." Del. Code tit. 8, § 279.

Plaintiffs' request for appointment of a receiver for 3HL fails for multiple reasons. First, as discussed above, 3HL has not been dissolved and this Court declines to do so. The record evidence reveals that the matters of which Plaintiffs complain were specifically addressed in the Subscription Agreements they signed and the accompanying confidential memorandum. There was no promise or guarantee of dividends, return on investment, or an IPO. The agreements fully disclosed Shealy's

33

status as 100% owner of management shares. The issues related to spending for marketing, removal and appointment of directors, and sale of stock are business judgment decisions. Plaintiffs have not come forward with evidence of the alleged fraud or gross mismanagement that they claim Shealy committed.

Second, § 279 makes clear that the Court of Chancery would be the appropriate forum to seek the appointment of a trustee or receiver of a dissolved Delaware corporation. Third, even if Plaintiffs could demonstrate this Court had the authority to appoint a trustee or receiver, Plaintiffs have not shown good cause. As Defendants point out in their motion, 3HL's operations do not demonstrate any basis for the appointment of a receiver: (1) 3HL has not instituted a capital campaign to sell stock in three years; (2) the Board of Directors was expanded to five in 2019 and implemented an additional Advisory Board; (3) 3HL implemented a Compensation Committee in 2019; (4) 3HL began in 2019 to have its financial statements audited by outside auditors; (5) 3HL is not the subject of any creditor claims; (6) 3HL is not the subject of any employee-related complaints; (7) 3HL is, and has always been, current in servicing its operational costs; (8) 3HL has no outside institutional debt; and (9) 3HL has over $3 million in cash reserves. Doc. 63 at 23–24 (citing Docs. 64-5, 64-9). Because no question of material fact exists that appointment of a receiver is unwarranted, Defendants are entitled to judgment in their favor as to Count III.

Accordingly, it is hereby

**ORDERED AND ADJUDGED**:

1.     Defendants' Motion for Summary Judgment (Doc. 63) is **GRANTED**.

2.     The Clerk is directed to enter Judgment in favor of Defendants 3rd Home Limited and 3rd Home Limited Co., and against Plaintiffs Johnathan Williams and Anthony Arona as to Count I and III of Plaintiffs' Complaint.

3.     The Clerk is directed to enter Judgment in favor of Defendant Wade Shealy and against Plaintiffs Johnathan Williams and Anthony Arona as to Count II of Plaintiffs' Complaint.

4.     The Clerk is further directed to terminate any pending motions and deadlines and **CLOSE** this case.

**DONE AND ORDERED** in Tampa, Florida on September 26, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties, if any